# UNITED STATES DISTRICT COURT

__Middle__ DISTRICT OF __Tennessee__

UNITED STATES OF AMERICA
V.
DEREK GILLIGAN, and
JOHN FRANKLIN RUPLEY

CRIMINAL COMPLAINT

Case Number: 15-3033 MB

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about __November 19, 2014__ (Date) in __Davidson__ County, in the __Middle__ District of __Tennessee__ defendant(s) did,

(Track Statutory Language of Offense)
combine, conspire, confederate and agree with each other, and other persons to distribute and possess with the intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

in violation of Title __21__ United States Code, Section(s) __846__.

I further state that I am a(n) __Special Agent, DEA__ and that this complaint is based on the following facts:
Official Title

See attached Statement in Support of Criminal Complaint incorporated herein.

Continued on the attached sheet and made a part of this complaint: ☒ Yes ☐ No

_____
Signature of Complainant

William Holton, Task Force Officer, DEA
Printed Name of Complainant

Sworn to before me and signed in my presence,

3/20/2015
Date

at Nashville, Tennessee
   City                State

JOE B. BROWN       U.S. MAGISTRATE
Name of Judge      Title of Judge

_____
Signature of Judge

# AFFIDAVIT IN SUPPORT OF COMPLAINT

Your affiant, William Holton, being duly sworn, deposes and states as follows:

1. I am currently employed as a Task Force Officer with the United States Drug Enforcement Administration (DEA) and have been so employed since June of 2012.

2. Prior to my assignment at DEA, I was a Narcotics Detective with the Rutherford County Sheriff's Department. I have over fifteen years' experience in law enforcement. In 1993, I began my career as a Military Police Officer in the United States Army. From 1998 until November 2000, I worked for the Marshall County Sheriff's Office. Since November 2000, I have worked for the Rutherford County Sheriff's Office. I was assigned to the Patrol Division until 2002 when I was promoted to an Interstate Crime Enforcement ("ICE") Deputy. From approximately October 2010 to May 2012, I worked as a Narcotics Detective. During my time as a Narcotics Detective and ICE Deputy, I made hundreds of arrests derived from the sale and distribution of narcotics.

3. I am currently assigned to the Nashville District Office of the DEA. During my tenure at DEA I have conducted narcotics and drug-related investigations involving violations of international, federal, and state narcotics laws. Currently, I am responsible for investigating crimes that involve the unlawful importation and exportation of controlled substances, the possession with the intent to distribute controlled substances, the distribution of controlled substances, the use of communication facilities to further these offenses, and the related crime of laundering monetary instruments, all in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 952, and Title 18, United States Code, Sections 1956 and 1957. In conducting these investigations, I have used a variety of investigative techniques and resources, which include, but are not limited to, conducting physical and electronic surveillance, monitoring court-authorized wiretaps, and managing

1

the use of cooperating sources ("CS" or "informants"). Through these investigations, my training and experience, in conjunction with conversations with other Agents, as well as other law enforcement personnel, I have become familiar with the methods used by drug traffickers, including, but not limited to, the methods of importing, packaging, transferring and distributing narcotics, the use of cellular telephones, pagers, the use of numerical codes, text messages, code words and other methods of avoiding detection by law enforcement, as well as the types and amounts of profits made by drug traffickers and the methods, language and terms that are used to disguise the source and nature of the profits from their illegal narcotics dealing. I also have extensive experience in debriefing defendants, co-conspirators, witnesses, and informants who have been involved in unlawful drug trafficking activities.

4. Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by Special Agents or Task Force Officers of the DEA, Officers of the Metropolitan Nashville Police Department, Deputies of the Wilson County Sheriff's Office or other law enforcement officers (collectively referred to as "Agents"). Unless otherwise noted, wherever I state that a statement was made, the information was provided by an Agent (who may have had either direct or hearsay knowledge of the statement) of to whom I have spoken or whose report I have read. All statements related herein, whether by law enforcement officers or not, are related in substance and in part, unless otherwise indicated. Information resulting from surveillance set forth is either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

5. This affidavit does not contain all the information known to me regarding this investigation but only what I believe to be sufficient facts for the sole purpose of establishing

probable cause for the arrest of **Derek GILLIGAN** and **John Franklin RUPLEY**. Therefore, I have not set forth each and every fact that I have learned during the course of this investigation. Facts not set forth herein are not being relied upon in reaching my conclusion that an arrest warrant should be issued. Nor do I request that the Court rely on any facts not set forth herein.

6. This affidavit is presented in support of an arrest warrant for and complaint charging that, beginning not later than November 19, 2014, in the Middle District of Tennessee and elsewhere, **Derek GILLIGAN** and **John Franklin RUPLEY** did combine, conspire, confederate and agree with each other, and other persons to distribute and possess with the intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

## Background

7. On February 25, 2015, Drug Enforcement Administration (DEA) Nashville District Office (NDO) Task Force Officers (TFO) the affiant and Kenneth Powers debriefed a Source of Information, hereinafter referred to as SOI. The SOI was debriefed regarding a Heroin Drug Trafficking Organization (DTO) operating in the Middle District of Tennessee (MDTN) and Toledo, Ohio. The SOI provided the following information to your affiant and TFO Powers. For simplicity, the SOI will be referred to utilizing masculine pronouns, not to infer gender.

8. The SOI stated that in the summer of 2014, he met Derek **GILLIGAN** at a gas station in Old Hickory, Tennessee. The SOI stated that **GILLIGAN** and his brother, John **RUPLEY**, work at Pops Custom Body Shop in Old Hickory, Tennessee.

9. The SOI stated that he had minor damage to the front of his vehicle. The SOI stated that

**GILLIGAN** noticed the damage and provided the SOI with a Pops Custom Body Shop business card.

10. The SOI stated that he eventually took his vehicle to Pops Custom Body Shop to get an estimate. The SOI stated that he was directed to a door down a hallway. The SOI stated that when he opened the door, he observed **RUPLEY** and **GILLIGAN** cutting up kilos of what he now believes to be heroin. The SOI stated that he had opened the wrong door and that **RUPLEY** hit him. The SOI stated that **RUPLEY** threatened him and told him he should not disclose to anyone what he had observed.

11. The SOI stated that he eventually started using Heroin and that **RUPLEY** and **GILLIGAN** were his Source of Supply (SOS). The SOI stated that since the summer of 2014, he has purchased between ten to fifteen grams of heroin a week from **RUPLEY** and **GILLIGAN**. The SOI stated that he does not consume that much heroin but is a go between for customers and **GILLIGAN** and **RUPLEY**. The SOI stated **RUPLEY** and **GILLIGAN** sell him heroin for $300 to $350 a gram. The SOI stated that **RUPLEY** and **GILLIGAN** purchase heroin from "Boon" for $100 a gram.

12. The SOI stated that he is afraid of **GILLIGAN** and **RUPLEY** because they are both very violent.

13. The SOI stated that **RUPLEY** and **GILLIGAN** lived on East Old Hickory Boulevard in Nashville, Tennessee. Your affiant and TFO Powers drove the SOI to East Old Hickory Boulevard. The SOI pointed out **RIPLEY's** and **GILLIGAN's** residence, which Agents identified as 665 East Old Hickory Boulevard.

14. The SOI stated that **RUPLEY** and **GILLIGAN** receive their heroin from Toledo, Ohio. The SOI stated that he has personally gone to Toledo, Ohio three times with either **GILLIGAN** or

4

**RUPLEY** to pick up heroin. The SOI stated that **RUPLEY's** and **GILLIGAN's** SOS is a black male in Toledo, Ohio, known only to the SOI as "Boon".

15. The SOI stated that on the first trip to Toledo, which was approximately in and/or around November 2014, he, **RUPLEY** and a white female named Tiffany last name unknown (LNU) took ten thousand dollars with the intent of purchasing 100 grams of heroin. The SOI stated Tiffany LNU body packed the heroin back from Toledo via a Greyhound bus. According to the SOI, **GILLIGAN** was incarcerated in Ohio during this trip because **GILLIGAN**, Shane LNU and a white female named Autumn LONG had been intercepted with heroin and marijuana.

16. Your affiant confirmed via a criminal history check that **GILLIGAN**, Shane PERSICH and Autumn LONG were arrested by the Miami County Sheriff's Office in Troy, Ohio on November 19, 2014, for narcotic related offenses.

17. The report stated that Daniel Shane PERSICH, Autumn LONG, and **GILLIGAN**, were stopped in Ohio by the Ohio State Highway Patrol for a traffic violation. During the course of the investigation of the traffic stop, Ohio State patrol Officers obtained a search warrant and discovered approximately forty nine grams of heroin which was secreted into Autumn LONG's vaginal cavity. All subjects were arrested as a result of the traffic stop.

18. The SOI stated that the second trip he took to Toledo, which was approximately in and/or around December 2014, he, **GILLIGAN** and Tiffany LNU took approximately nine thousand dollars with the intent to purchase 100 grams of heroin. The SOI stated that Tiffany LNU again body packed the heroin back to the Middle District of Tennessee via a Greyhound bus.

19. The SOI stated that on the third trip he and **GILLIGAN** made to Toledo, Ohio they were stopped by law enforcement in Odom County, Kentucky. The SOI stated that this trip was

approximately three months prior to this debriefing. The SOI stated that the police searched the vehicle and located approximately ten thousand dollars in a jacket pocket. The SOI stated that the jacket belonged to **GILLIGAN**. The SOI stated that the police located the U.S. currency and stopped searching.

20. Your affiant located a DEA-6 Case Number IA-15-0017 in which **GILLIGAN** was stopped on December 10, 2014, while traveling on I-71 heading North near the 22 mile marker. $9,109.00 was seized from **GILLIGAN** during the traffic stop.

21. The SOI stated that after being stopped by law enforcement, he and **GILLIGAN** continued their trip to Toledo to purchase heroin. The SOI stated that the heroin was again body packed by Tiffany LNU and four other white females whom he had never met. The SOI stated that during this trip, Tiffany LNU and a white male named Justin LNU were following him and **GILLIGAN** in another vehicle.

22. The SOI stated that Alaina RANK and Katie DIAS have also assisted in the transportation of Heroin from Toledo, Ohio to the Middle District of Tennessee. The SOI stated that RANK and DIAS are both prostitutes and that they advertise their services on backpage.com. The SOI stated that **RUPLEY** and DIAS are in a relationship but that **RUPLEY** still uses her as a prostitute. The SOI stated that RANK stays at the residence with **GILLIGAN**, DIAS, and **RUPLEY**. The SOI stated that DIAS was recently arrested by the Rutherford County Sheriff's Office for prostitution.

23. Your affiant arrested DIAS on February 11, 2015, in Nashville, Tennessee. DIAS was arrested on a Sealed Indictment out of Rutherford County, Tennessee for Conspiracy to Distribute over 300 pounds of Marijuana in a School Zone. DIAS met Agents at a hotel in Nashville, Tennessee after Agents set up a date with DIAS from an advertisement located on backpage.com.

24. The SOI stated that **RUPLEY's** cellular telephone number is 615-710-5855.

25. The SOI stated that **GILLIGAN's** cellular telephone number is 615-710-6622.

26. The SOI stated that **RUPLEY** drives a blue Chevrolet Malibu and that **GILLIGAN** drives a white Ford Van.

27. The night your affaint arrested DIAS in Nashville, Tennessee, she was driving a blue Chevrolet Impala, which she stated was a friends. Shortly after DIAS was arrested, a white Ford Econoline van with a green stripe arrived at the hotel. The van was occupied by a two white females and one white male. Your affiant recognized one of the females to be RANK. Your affiant recognized RANK from photographs posted on backpage.com and photographs Your affiant observed on RANK's Facebook page. The other white female identified herself as Tiffany LNU. The white male identified himself as Justin LNU.

28. Your affaint believes that the vehicle that DIAS was operating the night of her arrest is the same vehicle the SOI described as being **RUPLEY's**. The SOI stated **RUPLEY** drove a blue Malibu and DIAS was observed in a blue Impala, which she stated belonged to a friend. Chevrolet Malibu and Chevrolet Impala are very similar in design. The Chevrolet Impala is registered to Patrick Justin Clements.

29. Your affaint believes the white Ford van that was occupied by Tiffany LNU, Justin LNU and RANK the night of DIAS' arrest to be the same van the SOI stated belonged to **GILLIGAN**. The Ford van is also registered to Patrick Justin Clements.

30. On February 26, 2015, Metropolitan Nashville Police Department (MNPD) Officers went to 665 East Old Hickory Boulevard, Nashville, to attempt to serve an arrest warrant for **RUPLEY**. MNPD Officers were unable to contact **RUPLEY** at the residence. Later that day, the SOI contacted

your affiant and advised that the MNPD had been by 665 East Old Hickory Boulevard looking for **RUPLEY** and that **RUPLEY** and **GILLIGAN** were very spooked by the Police.

31. The SOI stated that **RUPLEY** ran out the back of the residence with a large amount of heroin and crack cocaine. The SOI stated that **RUPLEY** went to Shane PERSICH's residence which was later identified as 309 River Drive, Mt. Juliet, Tennessee. The SOI stated that **RUPLEY** and **GILLIGAN** were going to move from 665 East Old Hickory Boulevard and either leave the state or move in with Shane PERSICH.

32. On March 6, 2015, your affiant and TFO Powers interviewed a Rutherford County Sheriff's Office Confidential Source, hereinafter referred to as CS. For simplicity, the CS will be referred to utilizing masculine pronouns, not to infer gender.

33. The CS stated that he met **RUPLEY** through Autumn LONG in October of 2014. The CS stated that LONG would sell him heroin, which LONG obtained from **RUPLEY**.

34. The CS stated that in November of 2014, he started to purchase heroin straight from **RUPLEY**.

35. The CS stated that **RUPLEY**, **GILLIGAN**, Alaina RANK and Katie DIAS all resided at 665 East Old Hickory Boulevard. The CS stated that **RUPLEY** and **GILLIGAN** had a multiple camera security system with monitors at the residence.

36. The CS stated **RUPLEY** and **GILLIGAN** sold heroin in the Middle District of Tennessee and that their SOS was a black male known only to the CS as "Boom". The CS stated that **RUPLEY** and **GILLIGAN** would bring back around one hundred grams of heroin at a time. The CS stated that 'Boom" lives in Toledo, Ohio.

37. The CS stated **GILLIGAN** was stopped by law enforcement in Kentucky during a trip to

8

Toledo, Ohio. The CS stated that a large amount of U.S. currency was seized from **GILLIGAN**. The CS stated that the purpose of the trip was to purchase heroin in Toledo, Ohio from "Boom".

38. The CS stated that he made three trips to Toledo, Ohio at the direction of **RUPLEY** and **GILLIGAN** with the intent to purchase heroin from "Boom". The CS stated that each trip he made approximately fifty to seventy five grams of heroin was smuggled back. The CS stated that **GILLIGAN** and **RUPLEY** would obtain more heroin with each trip.

39. On March 2, 2015, Agents listened to Rutherford County jail calls from inmate Katie DIAS' account. On the same date at approximately 3:29pm, DIAS placed a telephone call to 615-710-5855. Agents believe that DIAS was talking to **RUPLEY**. During the call, **RUPLEY** stated that he had a serious problem and he could use DIAS' help. DIAS asked if "Mai Mai" was there. **RUPLEY** stated that they had not left yet, because they don't know how to get back, it was too much. **RUPLEY** stated that it was super good and the best that he has ever had. Based on your affiant's training, knowledge and experience I believe that **RUPLEY** and Katie DIAS were discussing the girls going up to Toledo, Ohio, and trying to bring back a large amount of heroin. **GILLIGAN** and members of his drug trafficking organization typically use females to body pack the heroin into body cavities during transportation, but because the quantity was more than usual, Agents believe that **RUPLEY** and **GILLIGAN** needed another female to come to Toledo, Ohio, to help body pack and transport the heroin back to Nashville, Tennessee. This is indicated during the jail call when **RUPLEY** told DIAS that he could really use her this time.

40. On March 3, 2015, the SOI contacted Agents and stated **GILLIGAN** and others unknown at this time were in Toledo, Ohio, and were scheduled to travel back to Nashville, Tennessee, with a large quantity of heroin. The SOI was not sure of exact details of how **GILLIGAN** and others would

9

travel back to Nashville, Tennessee, but heard **RUPLEY** say that it was too much for the girls to bring back. The SOI also heard that a female by the name of Christiania had been sent to Toledo, Ohio, to help with the transportation of heroin.

41.  On March 3, 2015, DEA TFO Powers obtained a cellular GPS ping order from Davidson County Judge Mark FishBurn for the cellular telephone (615) 710-6622 utilized by **GILLIGAN**.

42.  On March 6, 2015, DEA TFO Powers conducted surveillance in the area where the GPS ping data indicated **GILLIGAN**'s cellular telephone to be located, which was near the dead end of Overlook Drive in Mt. Juliet, Tennessee. The GPS ping at approximately 9:22 a.m. CST detailed a 2362 meter location perimeter. At approximately 9:22am, TFO Powers went to the area of 309 River Drive, Mt. Juliet, Tennessee, 37122. TFO Powers observed who he believed to be **GILLIGAN** standing outside of 309 River Drive, Mt. Juliet, Tennessee, next to a green and white Ford van. 309 River Drive is approximately 1200 meters from the dead end of Overlook Drive where the GPS ping indicted that **GILLIGAN**'s cellular telephone was located. Agents had previously received information from a SOI and a CS that the green and white van was the vehicle used to transport heroin back from Toledo, Ohio, to the Nashville, Tennessee area. Agents received further information that **GILLIGAN** and **RUPLEY** had moved from 665 East Old Hickory Boulevard and could possibly be staying with Katherine PERSICH and Shane PERSICH.

43.  On March 7, 2015, Agents were monitoring the location of the GPS pings. Agents noticed that the GPS was located in East Georgia. Later that day the pings indicated that the phone was traveling back to Tennessee on Interstate 24.

44.  On March 7, 2015, **GILLIGAN** and Alaina RANK were stopped, by the Rutherford County Sherriff Office in a green and white Ford van. During the stop, **GILLIGAN** told Officers that he had

10

Case 3:15-mj-03033   Document 1   Filed 03/20/15   Page 11 of 15 PageID #: 11

been at a funeral in Georgia and that he was on his way home. Rutherford County Officers searched the van and found a straw with residue in it and several baggies containing narcotics residue. Officers wrote **GILLIGAN** citation and released him.

45. On or about March 8, 2015, Agents were again monitoring **GILLIGAN**'s GPS ping location and noticed that the telephone began traveling north towards Kentucky and eventually to Toledo, Ohio. Nashville DEA Agent contacted Ohio DEA Agents. Ohio DEA Agents located the green and white Ford van that was driven by **GILLIGAN** at a hotel in Toledo, Ohio. Agents previously obtained information from the SOI and CS, that **GILLIGAN, RUPLEY** and other organization members would travel to Toledo, Ohio, to obtain heroin from a black male by the street name of "Boom." Once the heroin was obtained from "Boom," **RUPLEY** and/or **GILLIGAN** would go to either **GILLIGAN**'s grandmother's residence or stay in a hotel overnight. **GILLIGAN** or **RUPLEY** would arrange for several of the females to body pack or conceal the heroin. The females would travel back to Nashville, Tennessee, on a Greyhound bus or ride back to Nashville, Tennessee, in the green and white Ford van. Agents monitored the GPS pings from Toledo, Ohio, back to the Nashville, Tennessee area. TFO Powers went back and reviewed and investigated the movements of **GILLIGAN**'s GPS ping locations directly after **GILLIGAN** returned from Toledo, Ohio, with the suspected load of heroin. TFO Powers found that the GPS pings placed **GILLIGAN**'s telephone in the area of 309 River Drive, Mt. Juliet, Tennessee.

46. On March 12, 2015, Katie DIAS made multiple recorded jail telephone calls to **RUPLEY** on **RUPLEY**'s cellular telephone (615) 710-5855. **RUPLEY** advised DIAS that he had 300 grams buried out of state. Agents believe **RUPLEY** is referring to heroin which was acquired in Toledo, Ohio, by **GILLIGAN** on or about March 8, 2015.

47. On March 13, 2015, your affiant conducted a controlled telephone call to Katherine PERSICH utilizing the CS. Katherine PERSICH also advised the CS that she was going back to the residence located at 665 East Old Hickory Boulevard in order to finish moving out **RUPLEY** and **GILLIGAN**. Katherine PERSICH stated that some of the items removed from the above residence were being stored at her address.

48. On March 13, 2015, DEA Agents and members of the Wilson County Sheriff's Office executed a state search warrant at 309 River Drive, Mt. Juliet, Tennessee. A search of the residence led to the discovery of approximately two hundred and seventy two grams of heroin and over forty grams of cocaine.

49. The narcotics were located between the box springs and mattress of Katherine and Shane PERSICHS' bed.

50. TFO Powers interviewed Katherine PERSICH and asked if she knew why Agents were at her residence. Katherine PERSICH eventually stated that she understood that Agents were at her residence because of her association/criminal activity with **RUPLEY** and **GILLIGAN** and the large amount of heroin located under her bed.

51. Katherine PERSICH began by stating that she and Shane PERSICH met **RUPLEY** during a party that they were having at her residence in April or May of 2014. A mutual friend brought **RUPLEY** to the party. During the party, they began talking with **RUPLEY**. **RUPLEY** asked if they took pills. **RUPLEY** stated that he had a shipment of pills coming from Ohio and if they wanted he could get some pills for them. Shortly after the party, **RUPLEY** introduced his brother **GILLIGAN** to Katherine and Shane PERSICH. Within a month of meeting **RUPLEY** and **GILLIGAN**, Katherine and Shane PERSICH were introduced to heroin by **RUPLEY** and **GILLIGAN**. That same

month, **RUPLEY** and **GILLIGAN** moved in with Katherine PERSICH, Shane PERSICH and their three children.

52. Katherine PERSISCH stated that she began by snorting Heroin that was provided to her by **RUPLEY** and **GILLIGAN** in June of 2014. Katherine PERSICH stated that **RUPLEY** and **GILLIGAN** gave her and her husband heroin and some money in exchange for staying at the house and storing narcotics. Katherine PERSICH stated that she had seen **RUPLEY** and **GILLIGAN** with about twenty grams of heroin at a time and that **RUPLEY** and **GILLIGAN** obtained their heroin from a black male with the street name of "Boom" in Toledo, Ohio. Katherine PERSISCH stated that she had never been to Toledo, Ohio, with **RUPLEY** and/or **GILLIGAN** but her husband Shane PERSICH had been several times.

53. Your affiant interviewed Shane PERSICH. Shane stated that the narcotics located under the bed belonged to **GILLIGAN** and **RUPLEY**. Shane said that he had personally made three trips to Toledo, Ohio, with either **GILLIGAN** and/or **RUPLEY**. Shane stated that the last trip that Shane was involved with in Toledo, Ohio, he, **GILLIGAN** and Autumn LONG were arrested for possession of 50 grams of heroin by Ohio officials. Shane further stated that the Source of Supply in Toledo was a man by the name of "Boom." Shane stated that the heroin found under the bed belonged to **GILLIGAN** and **RUPLEY**. Shane stated that **GILLIGAN** brought the heroin over to his house on approximately March 6, 2015, and buried it in the back yard of his house. Shane stated that he dug the heroin up because he and Katherine needed to use some of the heroin.

54. On March 20, 2015, your affiant received a phone call from Shane PERSICH stating that **GILLIGAN** and an unknown female were banging on Shane's door. Wilson County Sheriff's Officers were dispatched to the residence. The officers encountered **GILLIGAN** and Leah KELLY.

Wilson County Sheriff Officers detained both **GILLIGAN** and KELLY and transported them to Wilson County Sheriff's Office to be interviewed.

55. Your affiant interviewed Leah KELLY. KELLY stated that she and **GILLIGAN** were in route to Shane PERSICH's house to obtain what she believed to be money. Prior to coming to Mt. Juliet, KELLY overheard **GILLIGAN** and **RUPLEY** discussing getting money out of a safe or digging up money in the yard. KELLY believed that after she and **GILLIGAN** obtained the money, she and **GILLIGAN** were going back to Tampa, Florida, to meet **RUPLEY**.

56. **GILLIGAN** and KELLY were found to be in possession of approximately $7,000 in United States Currency. KELLY stated the $7,000 was provided by **RUPLEY**. KELLY further heard **RUPLEY** tell **GILLIGAN** to bury the $7,000 under the tree and **GILLIGAN** knew "which tree."

57. Finally, KELLY stated that a black male known to her as "Boom," sells heroin to **GILLIGAN** and **RUPLEY**.

## CONCLUSION

58. Based upon my training and experience, and the totality of the facts described above, I believe there is probable cause that, beginning not later than November 19, 2014, in the Middle District of Tennessee and elsewhere, **Derek GILLIGAN** and **John Franklin RUPLEY** did combine, conspire, confederate and agree with each other, and other persons to distribute and possess with the intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.